IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2006 JUL -7  PM 1: 19

CLERK _____
SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR 106-075 |
| ) | |
| ANTONIO LEE TYLER ) | |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, Defendant Antonio Lee Tyler ("Tyler") is before the Court charged with Possession of Marijuana With Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1), Use of a Firearm During the Commission of a Crime of Drug Trafficking, in violation of 18 U.S.C. § 924(c), and Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g). The Court held an evidentiary hearing on Tyler's motion to suppress, in which he "challenges the detention of his person and the consequent warrantless search" of the car he had been driving just prior to his detention.[1] (Doc. no. 10). At the hearing, the Court heard testimony from former Richmond County Sheriff's Office

---

[1] Somewhat confusingly, the motion starts with a request that "any evidence of any contraband found on the premises occupied by the accused" be suppressed. (Doc. no. 10). Then, Tyler states that he is challenging the lawfulness of "the detention of his person and consequent warrantless search" of the vehicle he had been driving just prior to his detention. (Id.). Finally, the motion concludes with a request for "suppression of all evidence of contraband found during the search and consequent seizure." (Id. at 2 (emphasis added)). However, based on the testimony and argument at the hearing, it is apparent that Tyler is challenging his detention prior to the K-9 sniff and the resultant search of the vehicle he had been driving.

("RCSO") Investigator Brian Vallee ("Inv. Vallee"), RCSO K-9 handler Patricia Johnson ("Officer Johnson"), and Tyler.[2] Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.

## I. FACTS

The events forming the basis for the motion to suppress occurred on May 27, 2005, at the Raceway gas station/convenience store at 2161 Gordon Highway in Augusta, Georgia. In a nutshell, RCSO law enforcement officials had been directed to the Raceway by a confidential informant who reported that Tyler was involved with selling marijuana and would be arriving at the Raceway at a certain time and would be driving a blue Mazda with out-of-state tags. Upon finding Tyler at the Raceway at the designated time and in the blue Mazda with Florida tags, officers detained Tyler while a K-9 conducted a free-air sniff around the exterior of the vehicle. The K-9 alerted on the driver's side door of the car, and officers began a warrantless search of the car. The search turned up approximately 116 grams of marijuana in the glove box and a firearm in the center console. Tyler then signed a consent to search the apartment he had been sharing with his girlfriend, Natasha "Nikki" Hill ("Ms. Hill"). At the residence, officers found ten (10) small bags of marijuana on top of a bedroom dresser and a firearm under the pillow of the bed in the master bedroom.

Although the parties agree that the K-9 alert provided probable cause to conduct a warrantless search of the Mazda and that once contraband was discovered in the Mazda, Tyler signed a consent to search the residence he had shared with Ms. Hill, the Court heard divergent accounts of the sequence of events leading up to the commencement of the K-9

---

[2]Tyler invoked the Rule of Sequestration at the hearing.

free-air sniff of the Mazda. Thus, the Court will review the testimony of each witness appearing at the evidentiary hearing.

**A.     Inv. Vallee**

Inv. Vallee testified that prior to Tyler's arrest on May 27, 2005, he had been working with a confidential source to investigate Tyler's alleged involvement with selling marijuana. Inv. Vallee had come in contact with his source several days prior to Tyler's arrest because law enforcement officials had discovered that the source was growing four to six marijuana plants at his residence; there was no other marijuana found at the source's residence. Upon the discovery of these plants, the source said that he could offer information about a person selling marijuana, Tyler, but it would take him some time to get in contact with this person. Although the source was ultimately prosecuted for the marijuana plants, the decision was made at that time to follow up on the promised information regarding the person allegedly selling marijuana.

The source could not immediately reach Tyler by phone, but he knew the general area where he lived. Upon driving to the neighborhood, the source was flagged down by Tyler, who was reported as driving a bright blue, newer car with out-of-state tags, and the source asked about buying one-half pound of marijuana. The source reported to Inv. Vallee that Tyler told him he could not get the marijuana until the next day, May 27th, but the source did get Tyler's telephone number so that they could arrange to meet the next day.

At approximately 9:30 or 9:45 p.m. on May 27, 2005, Inv. Vallee received a call from the source and was told that Tyler had set a meeting to deliver the marijuana at a Raceway gas station on Gordon Highway, a location across town from where Inv. Vallee was already

3

working at the time the source contacted him.[3] Inv. Vallee and his team, including a K-9 unit, drove to the Raceway location and arrived to set up surveillance prior to Tyler's arrival. Inv. Vallee recognized Tyler when he drove up in the blue car with out-of-state tags that the source had described.[4] The officers pulled up to the vehicle Tyler had been driving when Tyler went inside the convenience store portion of the Raceway. Inv. Vallee sent another member of his team, Investigator Woods ("Inv. Woods"), into the store to bring Tyler back to the vehicle. Approximately one to two minutes later, Inv. Woods emerged with Tyler, and the K-9 unit approached the blue Mazda. Inv. Vallee testified that Tyler was not in handcuffs at the time he exited the convenience store and that Tyler could have walked away at the time that the K-9 unit was walking up to the Mazda. Inv. Vallee further testified that he thought he told Tyler why the officers were present,[5] and he asked Tyler if the blue Mazda was his. Tyler responded that the vehicle was a rental.

Officer Johnson then began the K-9 free-air sniff around the exterior of the vehicle, and the dog alerted at the driver's side door by sitting down. Inv. Vallee found eight clear plastic bags containing a total of 116 grams of marijuana in the glove box and a pistol in the center console. Inv. Vallee testified that it was at that point, after the drugs and weapon were found, that Tyler was handcuffed. Inv. Vallee asked Tyler where he lived, and Tyler

---

[3]Inv. Vallee testified that because he was across town from the designated meeting place, there was not adequate time to go pick up the source, drive the source to the Raceway, and be properly set up on the scene to investigate the criminal activity that was reportedly about to occur.

[4]Inv. Vallee had also pulled a picture of Tyler from prior jail records.

[5]Inv. Vallee testified that he thought he told Tyler why the officers were present because he recalled Tyler saying, "I can't believe Kaylen set me up."

responded that he resided at the address on his driver's license. However, Inv. Vallee, knowing that the source had reported driving to Tyler's neighborhood the day before, a neighborhood that did not encompass the address on the license, told Tyler that he knew that was not where Tyler lived. Receiving little cooperation from Tyler at that point, Inv. Vallee asked Inv. Woods, a former classmate or acquaintance of Tyler, to try to talk to Tyler to convince him to cooperate.

Inv. Vallee continued his search of the car while Inv. Woods talked to Tyler, and Inv. Vallee found a rental agreement that did not bear Tyler's name. The rental agreement bore the name of a person that Tyler identified only as a "friend." Inv. Vallee testified that Tyler eventually admitted that he had been staying with his girlfriend, Ms. Hill, who lived in the neighborhood that had been identified by the source as the location where he had asked Tyler about buying the one-half pound of marijuana.[6] Tyler then signed a consent form to allow the officers to search the residence he had been sharing with Ms. Hill, as well as a waiver of counsel form. Tyler stated that there was additional marijuana at the residence, but it was for "personal use."

When the officers arrived at Ms. Hill's residence with the signed consent form from Tyler, they did not ask permission from Ms. Hill to search, but neither did she deny permission to search or otherwise try to stop the search. Inside the residence, the officer found a clear bag containing approximately 10 small bags of marijuana, totaling about 30 grams of marijuana, on top of a dresser in the bedroom. A gun was also recovered under a

---

[6]The officers had also located a SCANA Energy bill in the Mazda that bore Tyler's name and the address of residence he had been sharing with Ms. Hill, 2702 Davis-Mill Road, Lot 33-F in Hephzibah, Georgia.

pillow on the bed in the bedroom. Another officer searching in the residence discovered an operational, digital scale in the attic. When Inv. Vallee approached Tyler again about cooperating, Tyler offered to "set up" someone, but he was evasive about who that person was and insistent that he tell Inv. Vallee how the operation should be handled.

Inv. Vallee went to discuss the situation with his superior. The superior stated that because Tyler was a convicted felon, any "set up" operation would have to be approved by Tyler's parole officer. However, because Tyler had not been completely forthcoming with officers and was suggesting that he dictate how a proposed "set up" operation should be handled, the decision was made to forego any proposed operation and to take Tyler to jail.

### B.     Officer Johnson

Officer Johnson, the K-9 handler who directed the dog through the free-air sniff of Tyler's car, testified that she has been a K-9 handler for approximately six years. She was originally certified after a one-month Basic Handler course, has been re-certified every year thereafter, and also possesses a national certification. Officer Johnson's dog, Chica, has also been certified, and was certified at the time of the May 27, 2005 free-air sniff of the Mazda Tyler had been driving. Chica's alert response to the odor of drugs is to sit.

Officer Johnson testified that Inv. Vallee asked her to direct Chica through the free-air sniff of the Mazda Tyler had been driving on the night of May 27th. She recalled being on the scene right after the Mazda pulled in to the gas pumps because she had been "riding with" Inv. Vallee's team that night. Officer Johnson did not recall actually seeing the Mazda pull up to the Raceway gas pumps or seeing Tyler exit the vehicle to go into the convenience store. She did, however, see Tyler standing by the Mazda after he had been brought out from

6

the convenience store, and she did not recall seeing handcuffs on him. Officer Johnson further testified that when she directed Chica in the free-air sniff, the dog did not make it all the way around the car, but instead she alerted at the driver's side door by sitting.

After the dog alerted on the car, Officer Johnson and her dog were directed to the residence that Tyler had consented to have searched. Inv. Vallee wanted a free-air sniff of the entire residence rather than merely relying on the location of drugs identified by Tyler. Chica alerted to the dresser where Tyler had stated the "personal use" drugs would be located.

### C.    Defendant Tyler

Tyler testified that he drove the blue Mazda to the Raceway on May 27, 2005 because his "associate" who lent him the car, Kaylen Prickett ("Prickett"), had asked for the car to be returned. Tyler further explained that he had borrowed the car so that Ms. Hill could drive it to work. Tyler had also borrowed the Mazda from Prickett on May 25th, but had returned it prior to picking it up again from Prickett on the evening of May 26th. Tyler maintained that Prickett had never asked him about buying marijuana and that he was merely at the Raceway at Prickett's request to return the car.

Tyler's version of what transpired at the Raceway varies from the testimony of Inv. Vallee and Officer Johnson. According to Tyler, when he pulled up to the gas pumps at the Raceway, he went inside the convenience store to pre-pay for the gas. Tyler testified that as soon as he handed his twenty dollars to the clerk, a RCSO official handcuffed him, took him

back outside to the Mazda, and all the while refused to tell him why he was being detained.[7] Although Tyler's affidavit swore that it was "several minutes" after he was taken out of the convenience store in handcuffs that the K-9 unit arrived (doc. no. 14, Ex.1), at the hearing, he testified that it was either two to three minutes after he exited the store, or right as he was walking up to the Mazda, that the K-9 unit arrived.[8] Tyler stated in his affidavit that he saw no visible sign that the K-9 alerted (id.), but he also conceded at the hearing that he did not know (prior to hearing Officer Johnson's testimony) what kind of trained responses are given when the odor of drugs is detected.

Tyler does not dispute that he signed a consent to search form for the residence he had shared with Ms. Hill, but he testified that he was no longer living there on May 27th - a fact that Tyler testified Ms. Hill told the officers upon their arrival.[9] Nevertheless, Tyler also conceded that Ms. Hill did not attempt to stop the search and that despite his separation from Ms. Hill, he was storing marijuana for his personal use in the bedroom of that residence. Tyler also testified that Ms. Hill, who knew that Tyler, as a convicted felon, could

---

[7]Contrary to Inv. Vallee's testimony, Tyler testified that someone other than Inv. Woods came into the convenience store to bring him back out to the Mazda.

[8]Tyler's sworn affidavit and hearing testimony also differed in that the affidavit stated that the "dog and handler circled the Mazda" (doc. no. 14, Ex. 1, p. 2), but at the hearing, Tyler testified that the dog started its sniff on the passenger side and then walked off once it came to the driver's side.

[9]According to Tyler, he gave consent to search the residence because the officers threatened to arrest Ms. Hill. Tyler maintained at the hearing that he was living in North Augusta at the time. The address on the driver's license that Tyler produced at the Raceway was for yet another residence, one located on Henry Street, a street that Inv. Vallee knew to be nowhere near Ms. Hill's neighborhood where the source had reportedly gone to meet with Tyler to discuss purchasing drugs.

8

not be in possession of a firearm, claimed ownership both of the gun found under a pillow on the bed in the residence he had been sharing with Ms. Hill and of the gun found in the Mazda.[10]

## II. DISCUSSION

According to Tyler, his encounter with officers at the Raceway violated the Fourth Amendment because it was not an investigatory detention based on reasonable suspicion, but rather was an improper arrest, unsupported by probable cause, because Tyler was handcuffed prior to the discovery of contraband in the vehicle. The government counters that not only was the investigatory detention warranted based on Tyler's arrival at a place and time and in a vehicle that were all correctly identified by an informant, but also that Tyler was not handcuffed until after the contraband was discovered in the car. Moreover, assuming only for the sake of argument that Tyler was handcuffed prior to the discovery of the contraband, the government argues that the handcuffs do not automatically transform an investigatory detention into a full-blown arrest.

### A.  Reasonable Articulable Suspicion for Initial Detention

Under Terry v. Ohio, 392 U.S. 1 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been

---

[10]Tyler explained that Ms. Hill had purchased the gun in the bedroom from Maurice Lorenzo Stokes ("Stokes"), a convicted felon with whom Tyler had been arrested in North Carolina for attempted larceny. Tyler stated that Ms. Hill purchased the gun so that Stokes could use the money to get out of jail. As to the gun in the Mazda, Tyler testified that Ms. Hill took the gun with her for protection at her job as a convenience store manager and must have forgotten to remove the gun before Tyler took the car to return it to Prickett.

committed. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" does require that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts. The officer must be able to articulate some minimal, objective justification for the investigatory detention. United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004); United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

In this case, prior to initiating their investigatory detention of Tyler, RCSO law enforcement officials had enough information to support an objectively reasonable suspicion that Tyler was involved in criminal activity. Specifically, a confidential source had reported to Inv. Vallee that Tyler would be at the Raceway gas station at a designated time, in a blue Mazda with out-of-state tags, and would be prepared to sell one-half pound of marijuana. Prior to detaining Tyler, the officers observed Tyler drive up to the gas pumps at the Raceway in a blue Mazda with Florida tags, at the time identified by the informant. Given those facts, the officers had reasonable suspicion to investigate whether Tyler also had the marijuana in his car that the source reported Tyler would have with him.

Upon determining that the officers had reasonable suspicion to investigate whether criminal activity was afoot, the Court must consider whether they diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain Tyler. See United States v. Sharpe, 470 U.S. 675, 686 (1985). However, there is no *per se* time limit on reasonable suspicion stops. United States v. Place, 462 U.S. 696, 709 n.10 (1983). Here, the evidence shows that the K-9 unit was at the scene and conducting a free-air sniff of the exterior of the Mazda within mere minutes of Tyler's arrival at the Raceway. Given that the courts have allowed Terry stops to last as long as seventy-five minutes, United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000) (*per curiam*), the Court is satisfied that the officers here diligently worked to confirm or dispel their suspicion of criminal activity involving drugs within minutes of Tyler's detention.

**B.  Reasonable Suspicion Ripens Into Probable Cause**

It is well settled that once an individual is legally stopped, conducting a K-9 sniff is not considered a "search" for constitutional purposes and may be done without any particularized suspicion. Place, 462 U.S. at 707; see also Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) (citing Place for proposition that walking narcotics detection dog around exterior of vehicles at highway checkpoint does not transform seizure into search). However, once the K-9 alerted on the Mazda, the officers had probable cause to obtain a search warrant.[11] United States v. Holloman, 113 F.3d 192, 194 (11th Cir. 1998) (*per curiam*);

---

[11] Additionally, the corroboration of the cooperating source's information may also be considered as part of the probable cause determination. The Eleventh Circuit has ruled, "Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting Illinois v. Gates,

United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (*per curiam*); see also United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (*per curiam*) (citing Banks for proposition that positive responses by drug dog establishes probable cause for search).

Although the officers here did not obtain a warrant, the facts show that the search following the K-9 alert falls under the automobile exception to the warrant requirement. This exception was first set forth in Carroll v. United States, 267 U.S. 132 (1925), wherein "the Court recognized that the privacy interests in an automobile are constitutionally protected; however, it held that the ready mobility of the automobile justifies a lesser degree of protection of those interests." California v. Carney, 471 U.S. 386, 390 (1985). Subsequently, the Supreme Court has explained the rationale for this exception as follows:

> Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's "ready mobility," an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear. California v. Carney, 471 U.S. 386, 390-391, 105 S. Ct. 2066, 2068-2069, 85 L. Ed.2d 406 (1985) (tracing the history of the exception); Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). More recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. Carney, *supra*, at 391-392, 105 S. Ct., at 2069-2070. If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more. Carney, *supra*, at 393, 105 S. Ct., at 2070.

Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)(*per curiam*); see also Watts, 329 F.3d at

---

462 U.S. 213, 238 (1983)). Corroboration of the details of a tip prior to a search are relevant to the totality-of-the-circumstances analysis. Gates, 462 U.S. at 241-42.

In any event, at the hearing, defense counsel conceded that the K-9 alert provided probable cause to search the Mazda.

1286 (noting two-part test for conducting warrantless search of automobile: vehicle is readily mobile/operational and existence of probable cause).

Here, the evidence demonstrates that officers were justified in conducting the warrantless search of the Mazda that uncovered 116 grams of marijuana from the glove box and a firearm from the center console. First, as the officers observed Tyler drive the Mazda up to the gas pumps at the Raceway, the car was obviously operational. Second, the K-9 alert at the driver's side door provided the requisite probable cause. Thus, the Court concludes that the warrantless search of the Mazda was permissible.

**C.     Timing of Change from Investigatory Detention to Arrest**

Given the valid basis for the Terry stop, the swiftness with which the officers worked to confirm or dispel their suspicions by using an on-scene K-9 unit to conduct a free-air sniff of the exterior of the Mazda, and the automobile exception to the warrant requirement that covered the subsequent warrantless search of the Mazda, the Court next turns its attention to the final prong of Tyler's argument for suppression. Tyler contends that he was handcuffed prior to the discovery of contraband in the Mazda, allegedly transforming the Terry stop, which was justified by reasonable suspicion, into an arrest that was not yet justified by probable cause. The government denies that Tyler was handcuffed prior to discovery of the contraband, but even assuming he was handcuffed as he claims, the handcuffs do not automatically turn his investigatory detention into a full-blown arrest.

The Court first turns its attention to making a credibility determination about the testimony concerning when Tyler was handcuffed during his encounter with law enforcement officials at the Raceway. Of course, the Court's finding on this issue is shaped by its analysis

13

of conflicting testimony in the record. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

When weighing the credibility of the differing versions of whether Tyler was handcuffed inside the convenience store before the search of his car or after the discovery of the drugs and gun in the Mazda, the evidence weighs in favor of the government's version of events. First, Inv. Vallee positively testified that Tyler was not handcuffed when he was brought out from the convenience store to the Mazda,[12] and Officer Johnson confirmed that she did not recall seeing Tyler in handcuffs.[13] Moreover, despite the fact that there were other people present on the scene, Tyler presented no witnesses to support his self-serving version of events. Neither the clerk to whom he allegedly handed his money right before he

---

[12]The Court also notes that Inv. Vallee is now a Southern Nuclear Officer at Plant Vogtle and therefore has no hope for gain or advancement - or avoidance of discipline - at the RCSO by misrepresenting when Tyler was handcuffed.

[13]Inv. Vallee's and Officer Johnson's recitation of the events at the Raceway were substantially similar even though neither was present in the courtroom during the other's testimony because of the invocation of the Rule of Sequestration.

14

was handcuffed inside the store, nor the officer who allegedly did the handcuffing were called to the stand or offered affidavits in support of Tyler's version of events.[14]

Moreover, Tyler's testimony as a whole contained several internal inconsistencies. On cross-examination by the government, Tyler declared, "I don't deal with drugs." Yet, he also freely admitted that he had placed approximately 30 grams of "personal use" marijuana in the home at Davis-Mill Road where the mother of his young child/sometimes girlfriend and his young child lived.[15] There was also the unexplained presence of an operational digital scale stored in the attic of the Davis-Mill Road residence.

Tyler also testified that he and Ms. Hill were separated on May 27th, and yet he was borrowing a car from a person who he knew was too young to validly possess a rental car so that Ms. Hill would have transportation to work. He also still carried with him keys to the Davis-Mill Road residence, and the SCANA Energy bill found in the Mazda was registered in his name. Moreover, the informant who had provided corroborated information to Inv. Vallee also reported that Tyler resided off of Davis-Mill Road and drove there, not to North

---

[14]Tyler disputes Inv. Vallee's testimony that it was Inv. Woods who was directed to retrieve Tyler from the convenience store. Tyler called neither Inv. Woods nor the other officer who allegedly came inside the store as a witness at the evidentiary hearing. As Inv. Vallee was able to name at the hearing the officers working with him that night, and as the government has an "open file" discovery policy, it stands to reason that even if Tyler could not recall the name of the person who handcuffed him, he had the means available to figure it out and put on evidence from that person at the hearing called specifically to address his motion to suppress.

[15]Tyler's explanation that he was storing the drugs at the Davis-Mill Road residence rather than his apartment in North Augusta because he wanted to avoid problems with his probation in South Carolina does little to aid a perception of trustworthiness, candor, or honesty. Not only does it suggest a knowing violation of the rules of his probation, but it shows a purposeful attempt to evade detection at the expense of storing contraband in the residence occupied by his child and the mother of his child.

Augusta or to the Henry Street address on Tyler's license, to locate Tyler in an effort to set up a marijuana purchase. Finally, it makes little sense that Tyler would consent to search a residence over which he thought he had no dominion, particularly in light of the fact that Ms. Hill did not object or otherwise attempt to stop the search when officers arrived at her doorstep well after nightfall with a K-9 in tow.[16]

Tyler also offered incredible testimony concerning the weapons that were discovered. He testified that the gun in the Mazda belonged to Ms. Hill, who, although she knew that Tyler was a convicted felon, accidently left the gun in the car after taking it to work at a convenience store for protection. It also seems incredible that someone would forget to remove a gun used for protection from a rental car that had come into her possession from a dubious source (via a "separated" boyfriend who received it from an underage driver who obviously had to obtain it from someone else). Moreover, Tyler testified that Ms. Hill carried the gun with her to work as a matter of course, and since Ms. Hill knew Tyler could not be around guns, would she not then have some routine for storing the gun when it was not with her at work so as to avoid having it around Tyler? Even if that routine involved hiding it under a pillow in the bedroom of a home with a small child in residence, as was apparently done with the Smith and Wesson recovered when officers searched the Davis-Mill Road residence, it seems unlikely that the weapon would have been accidently left in the Mazda. The Court also notes that Tyler testified he was still in contact with Ms. Hill, who

---

[16]Tyler's belated testimony that officers coerced him into signing the consent to search by threatening to arrest Ms. Hill rings hollow in light of the fact that these allegations appear nowhere in his motion to suppress, briefing in support, or affidavit that were filed prior to the hearing.

16

was present at the evidentiary hearing but did not offer any testimony in support of Tyler's version of events as it related to her role in the events of May 27th.

Having reviewed the testimony at the hearing, noted inconsistencies and/or an apparent lack of candor in Tyler's testimony on multiple fronts, observed the demeanor of the witnesses, and considered the interests of the witnesses, the Court concludes that Tyler's testimony about when he was handcuffed is simply not credible. In sum, the Court credits the testimony of the government's witnesses over that of Tyler and concludes that Tyler was not handcuffed until after the contraband was discovered in the Mazda. Thus, the Court concludes that there was no custodial arrest prior to the development of the necessary probable cause occasioned by the discovery of contraband in the Mazda.

Finally, because the Court credits the testimony that Tyler was not handcuffed prior to the discovery of the contraband in the Mazda, it need only briefly touch on the government's alternative argument that even if Tyler was handcuffed in the convenience store, such actions would not have turned the Terry stop into a custodial arrest. The Eleventh Circuit has outlined four considerations for drawing the line between a Terry-stop and an arrest: "[1] 'the law enforcement purposes served by the detention, [2] the diligence with which the police pursue the investigation, [3] the scope and intrusiveness of the detention, and [4] the duration of the detention.'" Acosta, 363 F.3d at 1146. In discussing the third prong, the Acosta court specifically recognized that handcuffing a suspect does not necessarily change an investigatory stop into an arrest; the measures needed to assure an officer's personal safety must be taken into consideration. Id. at 1147; see also Gil, 204 F.3d at 1350-51 (affirming denial of motion to suppress where defendant had argued that her

17

seventy-five minute detention in handcuffs during <u>Terry</u> investigation amounted to improper arrest without probable cause).

Here, the officers came to the scene expecting to investigate the possibility of a drug sale by a person known to have a prior criminal record, who as it turns out, had a weapon in the car in which he arrived on the scene. Moreover, as discussed above, the K-9 sniff and discovery of contraband happened within minutes of the officer's arrival and detention of Tyler. Thus, even if the Court had credited Tyler's testimony over that of Inv. Vallee and Officer Johnson, such a method of detention was reasonable under the totality of the circumstances to maintain the officers' safety while the investigation of the officers' reasonable suspicion of criminal activity was quickly and efficiently performed.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Tyler's motion to suppress be **DENIED**. (Doc. no. 10).

SO REPORTED and RECOMMENDED this 7th day of July, 2006, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

# United States District Court
## Southern District of Georgia

UNITED STATES OF AMERICA     *

      vs.                         *       CASE NO. CR106-075

ANTONIO LEE TYLER         *

                                  *

                                  *

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Report and Recommendation dated 7/7/06, which is part of the official records of this case.

Date of Mailing:   7/7/06
Date of Certificate:   7/7/06

SCOTT L. POFF, CLERK

By: _L. Debden_ (signature)

NAME:
1. Antonio Lee Tyler
2. Peter Johnson
3. 
4. 
5. 
6. 
7. 

Cert/Copy
- ☐ ☐ District Judge
- ☐ ☒ Magistrate Judge
- ☐ ☐ Minutes
- ☐ ☐ U.S. Probation
- ☐ ☐ U.S. Marshal
- ☐ ☒ U.S. Attorney
- ☐ ☐ JAG Office

Cert/Copy
- ☐ ☐ Dept. of Justice
- ☐ ☐ Dept. of Public Safety
- ☐ ☐ Voter Registrar
- ☐ ☐ U.S. Court of Appeals
- ☐ ☐ Nicole/Debbie
- ☐ ☐ Ray Stalvey
- ☐ ☐ Cindy Reynolds